# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KIZZIE FERGUSON, ex rel. A.F., a minor,    )
                                       )
                  Plaintiff    )
                                       )        No. 11 C 2248
           v.             )
                                       )
                                       )        Magistrate Judge
MICHAEL J. ASTRUE, Commissioner of    )         Michael T. Mason
Social Security,                       )
                  Defendant    )
                                         )

## MEMORANDUM OPINION AND ORDER

Plaintiff Kizzie Ferguson (plaintiff or "Ms. Ferguson") has filed a motion for summary judgment seeking judicial review of the final decision of the Commissioner for Social Security ("Commissioner").  Ms. Ferguson seeks Supplemental Security Income ("SSI") under Title XVI of the Social Security Act on behalf of her minor child ("A.F."). The parties consented to the jurisdiction of this Court pursuant to 28 U.S.C. § 636(c), and have filed cross-motions for summary judgment.  For the reasons set forth below, Ms. Ferguson's motion for summary judgment is granted in part, the Commissioner's motion for summary judgment is denied, and the case is remanded to the Administrative Law Judge (the "ALJ") for further proceedings consistent with this opinion.

## I.  PROCEDURAL HISTORY

Ms. Ferguson filed this action for SSI on behalf of A.F. on January 19, 2007.  (R. 104.)  She bases her claim on A.F.'s Attention Deficit Hyperactivity Disorder ("ADHD").  (*Id.*)  She alleges a disability onset date of April 1, 2004.  (R. 213.)  The claim was initially denied on March 29, 2007.  (R. 104.)  A request for reconsideration was filed on May 20,

2007, which was denied on October 9, 2007.  (R. 131-36.)  Ms. Ferguson filed a request

for a hearing on February 14, 2008, and the hearing was held on July 10, 2008.  (R. 137,

152.)  At Ms. Ferguson's request, a supplemental hearing was held on February 3, 2009.

(R. 28.)  The ALJ denied her claim on October 14, 2009, and Ms. Ferguson subsequently

filed this action.  (R. 126.)

## II.  FACTUAL BACKGROUND

### A.  Medical Evidence

#### 1.  Dr. Michael Hammer

A.F. was born on September 12, 1994.  (R. 213.)  Dr. Michael Hammer first

diagnosed A.F. with ADHD on April 28, 2004 when he was 9 years old.  (R. 376.)  At this

initial appointment, Dr. Hammer noted that A.F. was unable to focus, was easily

distracted, and was performing poorly at school.  (R. 298.)  Dr. Hammer prescribed

Adderall.  (*Id.*)  At a visit on June 9, 2004, Dr. Hammer noted that A.F. was having

trouble with the Adderall prescription because it was causing a decrease in his appetite

and he was having more difficultly focusing.  (R. 297.)

A.F. saw Dr. Hammer a few times between April of 2004 and August of 2004 and

then not again for three years.  (*Id.*)  When A.F. returned to Dr. Hammer in 2007, Dr.

Hammer prescribed Daytrana 30 mg patches.  (*Id.*)  In a report dated February 9, 2007,

Dr. Hammer also recommended that A.F. have his own room so that he can concentrate

and focus in his own space.  (R. 341.)

In a report to the Bureau of Disability Determination Services dated September

26, 2007, Dr. Hammer observed that A.F. had been doing well with good hygiene and

good motor activity, but also noted that A.F. was still easily distracted by extraneous

stimuli, had difficulty waiting his turn, had difficulty sustaining attention in tasks, and had difficulty organizing his work.  (*Id.*)  Dr. Hammer also noted that A.F. interrupts and intrudes, often loses items necessary for task completion, had a lack of consideration of consequences of dangerous activity, and exhibited inappropriate attention seeking behavior.  (R. 377.)  Dr. Hammer found that these conditions impacted A.F.'s relationships with family and friends, his care of personal property, and his school behavior and achievement.  (*Id.*)  He also determined that A.F. was non-compliant and uncooperative, lacked responsibility for his own actions and lacked respect for other people or property.  (*Id.*)  Dr. Hammer noted that he saw A.F. on three occasions in 2004 and diagnosed him with combined ADHD and learning problems.  (R. 378.)  He also noted that at the time, his mother did not want him on medication.  (*Id.*)

In a subsequent report dated July 16, 2008, Dr. Hammer noted that A.F.'s behavior was getting worse and he observed that A.F. had difficulty concentrating, had poor impulse control, was forgetful, and did everything very quickly.  (R. 485.)  At this visit, Dr. Hammer prescribed Focalin.  (*Id.*)  Dr. Hammer saw A.F. again on October 30, 2008 and noted his behavior was again worse than the previous visit, and he also observed that A.F. was doing worse in school.  (R. 501.)  He noted that A.F. had stopped taking his medication, and he observed that he had been doing better in school when he was taking Daytrana.  (*Id.*)

### 2. Kristina Granahan

Kristina Granahan ("Ms. Granahan"), an occupational therapist, began treating A.F. on May 16, 2004, when A.F. was nine years old.  (R. 293.)  A.F. was referred to Ms. Granahan after Dr. Hammer raised concerns about A.F.'s sensory processing skills.  (*Id.*)

At this initial appointment, Ms. Granahan noted that A.F. has a history of very active behavior and decreased attention to tasks. (*Id.*)  Dr. Granahan noted that A.F. was able to sit down at a table and complete testing materials without distraction. (*Id.*)  She also noted that he maintained his attention to a task for more than 20 minutes at a time and he was able to initiate conversation. (*Id.*)  Additionally, A.F.'s fine motor skills and visual skills were age appropriate, his visual perception skills tested at the 61st percentile and his motor coordination skills tested at the 53rd percentile. (*Id.*)

Ms. Granahan also found that A.F. demonstrated "decreased sensory processing skills in the areas of auditory, touch, multisensory, and oral sensory processing." (R. 293.)  She noted that A.F. talked himself through tasks, used inefficient ways of doing things, became anxious when there were changes in plans, and had difficulty tolerating changes in routines, which Ms. Granahan noted was "indicative of behavioral outcomes of decreased sensory perception skills." (*Id.*)  She also noted that A.F. had difficulty processing auditory information and was distracted or had trouble functioning if there is a lot of noise around. (*Id.*)

In addition, Ms. Granahan noted that A.F. had characteristics reflecting deceased tactile processing including: "avoids getting messy, expresses distress during grooming, prefers long-sleeved clothing when it is warm/short-sleeves when it is cold, expresses discomfort at dental work or tooth-brushing, is sensitive to certain fabrics, becomes irritated by socks and shoes, has difficulty standing in line or close to other people... [and] has difficulty paying attention." (R. 294.)  As a result of A.F.'s diminished sensory processing skills, Dr. Granahan noted that A.F. had difficulty with activities of daily living, including an inability to complete his chores or finish tasks that he has started. (*Id.*)  She

recommended occupational therapy once or twice every week for 26 weeks and then a re-assessment.

### 3. Dr. Joseph Vaal

A.F. began seeing Dr. Joseph Vaal, the school psychologist, on December 7, 2006. (R. 311.) Dr. Vaal's records from this date indicate that A.F. was referred to him due to concerns about his school performance, including "attention, comprehension, transitions from task to task, and following directions." (*Id.*) After evaluating A.F's standardized test results, Dr. Vaal noted that A.F. had: 1) "Potentially average cognitive ability with a significant verbal-nonverbal difference across multiple measures;" 2) "Generally average academic achievement scores with lower scores in reading comprehension and math operations;" and 3) "Indications of significant attentional issues in the classroom, [c]onsistent with his diagnosis of AD/HD." (R. 313.)

### 4. Dr. Rebecca Bier

On March 15, 2007, Dr. Rebecca Bier completed an ADHD Report from the Bureau of Disability Determination Services. (R. 348.) In this report, she noted that A.F. was easily distracted and had difficulty focusing and paying attention, although he was in a good mood, was able to maintain eye contact, and he appeared to have good hygiene. (*Id.*) Dr. Bier noted that A.F. had been diagnosed with ADHD in April of 2004, that he had previously been taking Adderall and Metadate and that he was now taking Daytrana. (*Id.*) She also noted that the Daytrana caused him to have a poor appetite, and caused him to feel groggy in the morning, and lacking in motivation. (*Id.*) Dr. Bier noted that A.F. was fidgety, had difficulty sitting still, was easily distracted by extraneous stimuli, had difficulty waiting his turn, often blurted out answers before the question was

completed, had difficulty listening to and following instructions, and had difficulty
sustaining attention in tasks and in organizing work.  (*Id.*)  She also found that A.F.
shifted often from one uncompleted task to another, had difficulty playing quietly, talked
excessively, interrupted and intruded, often lost items necessary for task completion, was
lethargic and passive, and displayed inappropriate attention seeking behavior.  (R. 349.)
Due to these symptoms, she found that A.F.'s sleep patterns, meal times, his shopping
patterns, his care of personal property, his ability to use public transportation, his social
activities and interests, and his school behavior were all negatively impacted by his
ADHD.  (*Id.*)  Dr. Bier also found A.F. to be argumentative, non-compliant and
uncooperative, and irritable.  (*Id.*)  Dr. Bier concluded her findings by noting that A.F. had
been struggling with ADHD for a long time, and that his mother had to supervise all of his
activities.  (R. 350.)

### 5. Dr. Pamela Cava

On May 15, 2008, A.F. sought a cardiac consultation from Dr. Pamela Cava for
chest pain and ADHD.  (R. 477.)  A.F. had experienced chest pain on two occasions:
once when he was kneed in the chest playing basketball, and his pain lasted for three
days; and then again when he was in his home, and the pain lasted for only a few
seconds.  (*Id.*)  Dr. Cava performed a physical examination and found normal cardiac
functioning, normal respiration, and good pulses in all of his extremities.  (*Id.*)  Dr. Cava's
impressions of A.F. included a functional heart murmur, ADHD, normal cardiac
examination, and he found that A.F.'s chest pain was related to trauma and was non-
cardiac in origin.  (R. 478.)

### 6. Dr. Shaku Chhabria

A.F. was also seen by a child neurologist, Dr. Shaku Chhabria. On August 23, 2004, Dr. Shaku Chhabria noted that A.F. underwent an EEG, which was "essentially normal." (R. 299.) Years later, in early 2007, Dr. Chhabria conducted another evaluation and noted A.F.'s hyperactivity, impulsivity and inattention, all consistent with ADHD. (R. 334.) His physical exam was normal and his speech and memory appeared normal. (R. 335.) His motor exams were also normal. (*Id.*) Dr. Chhabria's impressions were that A.F. suffered from ADHD, a learning disability, partial complex seizures, and sensory disintegration. (R. 336.) Dr. Chhabria recommended a Daytrana prescription and followup. (*Id.*)

### 7. Dr. Badr Javed

On August 28, 2008, Dr. Badr Javed performed a psychiatric assessment and found that A.F. had ADHD with sensory integration problems. (R. 496.) Dr. Javed noted that A.F. had problems with hyperactivity and inattention, trouble following conversations and completing work, a short attention span, and needed much redirection. (*Id.*) He also noted that A.F. bothered others and took a long time to finish his work. (*Id.*) Dr. Javed stated that A.F. does not start fights nor does he threaten others, but he has destroyed things in his room when he does not get his way. (*Id.*) His mother claimed that he has had anxiety for a long time, he worries about things that an older person should worry about, and he worries when plans change. (*Id.*) The mental status examination of A.F. found him to be apathetic, as he was sprawled sideways and eventually slumped down into the chair. (R. 497.) Most of his answers were "I don't know," and he shrugged at very basic questions. (*Id.*) A.F. was not found to be suicidal or homicidal, and he was determined to be oppositional by lack of participation. (*Id.*) Dr. Javed diagnosed A.F.

with Oppositional Defiance Disorder ("ODD").  (*Id.*)  A.F. was given Focalin, which appeared to be working better than previous drugs.  (R. 500.)

On October 23, 2008, A.F. saw Dr. Javed again, who noted that he experienced chest pains and headaches while on Focalin and discontinued the use.  (R. 500.)  Dr. Javed also noted that A.F. nearly fell asleep in the waiting room, then proceeded to the examination room and sprawled out sideways showing disinterest and defiance.  (*Id.*)

### 8. Dr. Harry Whelan

A.F. was referred to Dr. Harry Whelan for a neurology consultation for his headaches and staring spells.  (R. 502.)  Dr. Whelan found that, in addition to his ADHD, A.F. suffered from migraines, and that migraines were a problem that ran in his family.  (*Id.*)  Dr. Whelan concluded that A.F.'s staring spells were caused by inattentiveness due to his ADHD or a manifestation of one of his migraines.  (*Id.*)  Dr. Whelan also said that A.F. may have been having seizures, and he ordered an EEG and an MRI.  (*Id.*)


### B. Education Evidence

Records from A.F.'s school indicate that his problems in the classroom began in early 2003.  (R. 306.)  At that time, A.F.'s teachers reported that he was "easily distracted," "can't repeat directions back," and is "out of his seat," "very active" and "constantly talking."  (*Id.*)  Similar reports were made throughout 2003 noting his difficulty focusing and listening in the classroom, and his hyper active and impulsive behavior in general.  (R. 300-05.)  These reports prompted the teachers and administrators at A.F.'s school to meet with his parents and suggest medical intervention.  (R. 300.)

The school records reflect another parent-teacher conference was held on January 11, 2007. (R. 319.) At that meeting, it was noted that A.F. struggles with organization and reading comprehension, is often "off task and needs prompting to complete work," and although he turns in his homework, it is often incomplete or done incorrectly. (*Id.*) The notes from this meeting also reflect that A.F. did not respond well to the Adderall medication that was prescribed for his ADHD. (*Id.*)

In addition, evidence from several of his teachers and evaluators was submitted to the ALJ, and this evidence is outlined below.

### 1. Special Education Teachers Bonnie Horan and Nicole Brooks

On September 26, 2007, A.F.'s special education teacher Bonnie Horan completed a Teacher Questionnaire when A.F. was in seventh grade. (R. 383.) She indicated that A.F. was reading at a fifth grade level and writing at a fourth grade level. (*Id.*) In the Teacher Questionnaire, Ms. Horan was asked to evaluate A.F. in six different domains of functioning relevant to childhood disability determinations, on a scale of one to five, one being "no problem", two being "a slight problem," three being "an obvious problem," four being "a serious problem," and five being "a very serious problem." (*Id.*) As explained in more detail below, these domains are important because the ALJ's decision on disability depends, in part, on whether a claimant had a "marked limitation" in two or more domains or an "extreme limitation" in one domain.

The first domain is "Acquiring and Using Information." In this domain, Ms. Horan noted that A.F. had "an obvious problem" in understanding school and content vocabulary, providing organized oral explanations and adequate descriptions, and expressing ideas in written form. (R. 384.) She also noted "a slight problem" in six other

categories.  (*Id.*)  In the second domain, "Attending and Completing Tasks," she found that he had "a slight problem" in focusing long enough to finish assigned work, refocusing when necessary, carrying out multi-step instructions, organizing his own things or school materials, completing class/homework assignments, completing work accurately without careless mistakes, working without distracting himself or others, and working at a reasonable pace and finishing on time.  (R. 385.)  Ms. Horan also found that A.F. had no problems in the remaining domains, which are "Interacting and Relating with Others," "Moving About and Manipulating Objects," and "Caring for Himself or Others."  (R. 386-88.)

In A.F.'s Individualized Education Plan ("IEP") Conference Summary dated January 9, 2008, A.F.'s teachers Bonnie Horan and Nicole Brooks noted that A.F. was a popular boy who got along well with others, but was occasionally off task and needed reminding to get back on task.  (R. 436.)  His teachers noted that he struggled with reading comprehension, he needed assistance with keeping his materials clean and organized, and that he can maintain organization for only a short period of time.  (*Id.*)  They also noted that he had "wonderful grades" and "hardly ever missed any homework assignments."  (*Id.*)  A.F.'s IEP indicated that increasing his reading comprehension was a goal because he currently has difficulty recalling information from passages he reads.  (R. 437.)  The IEP also suggested that he focus on increasing his organizational skills because he has difficulty keeping his school materials organized.  (R. 438.)

### 2.  Special Education Teacher Carrie Dreerwatcher

Carrie Dreerwatcher, another special education teacher, also completed a Teacher Questionnaire when A.F. was in seventh grade.  (R. 383.)  Like Ms. Horan, Ms.

Dreerwatcher indicated that A.F. was reading at a fifth grade level and writing at a fourth grade level. (R. 394.) Ms. Dreerwatcher also noted that A.F. had problems in the "Acquiring and Using Information" domain; in particular, she found "a slight problem" in almost every category in this domain and "an obvious problem" in expressing ideas in written form. (R. 395.) She also noted that A.F. had problems in the second domain, "Attending and Completing Tasks." In particular, she found A.F. had "a slight problem" in focusing long enough to finish assigned activity, refocusing to task when necessary, carrying out multi-step instructions, organizing his own things and school materials, completing class or homework assignments, and completing work accurately without careless mistakes. (R. 396.) Also like Ms. Horan, Ms. Dreerwatcher found that A.F. had no problems in the remaining domains. (R. 397-98.)

### 3. Special Education Teacher Jan Russert

Jan Russert, also a special education teacher, completed a request for administrative information on March 14, 2007, and she noted that A.F. had scored in the 21st percentile in the reading portion of the Illinois standardized achievement test and in the 45th percentile on the math section of the test. (R. 406.) She also noted that he received special education instruction for four hours a week. (*Id.*)

In her Teacher Questionnaire, she noted that she had known A.F. for seven and a half months and saw him for 300 minutes a week in all academic subject areas. (R. 407.) Ms. Russert noted that A.F. had problems in the "Acquiring and Using Information" domain. In particular, she noted that he had "a very serious problem" with reading and comprehending material and applying problem solving skills in class discussions. (R. 410.) She also noted that he had "a serious problem" with understanding school and

content vocabulary, providing organized oral explanations and adequate descriptions, and expressing ideas in written form. (*Id.*) Ms. Russert also noted that A.F. had significant problems in the "Attending and Completing Tasks" domain. She found he had "a very serious problem" focusing long enough to finish assigned activities or tasks, organizing his own things or school materials, and completing work accurately without careless mistakes. (R. 411.) She also indicated that A.F. had "a serious problem" carrying out multi-step instructions, working without distracting himself or others, and working at a reasonable pace/finishing on time. (*Id.*) Like his other special education teachers, Ms. Russert found no problems in the remaining domains. (R. 412-14.) Ms. Russert concluded her Questionnaire by noting that A.F.'s "hyperactivity causes him to be very fidgety, distracting the people around him" and that his hyperactivity "creates a lack of focus or time on task during class work discussion and teaching." (R. 415.)

Ms. Russert also sent Ms. Ferguson an email on April 11, 2007 regarding A.F.'s behavior in school. (R. 443.) She noted an increase in his inattention, fidgeting, mumbling, and doodling. (*Id.*) She stated that the teachers have to do more prompting of him to "get on task" and to stay focused. (*Id.*)

#### 4. Special Education Supervisor Nancy Waggoner

On April 29, 2008, special education superviser Nancy Waggoner wrote a letter regarding A.F.'s condition. (R. 447.) In her letter, Ms. Waggoner stated that A.F. had a diagnosis of ADHD and that initiating, sustaining, and shifting attention were all concerns for A.F. (*Id.*) She stated that A.F. needs support in reading comprehension and organization. (*Id.*) Ms. Waggoner noted that he benefits from "extra time on tests, preferential seating, defined expectations, reduced auditory and visual distractions,

frequent prompts, directions given in small steps, shortened or modified assignments, assistance with organization, a missing assignment sheet, study guides, graphic organizers, repetition and rephrasing, positive reinforcement, understanding checks, and reinforcement of long term assignment timelines." (*Id.*) She also noted that his special needs "can have a significant financial impact on his family." (*Id.*) In particular, she noted that Ms. Ferguson "finds providing medicine, therapeutic activities such as counseling, swimming or other physical activities an extreme monetary burden." (*Id.*) She added that Ms. Ferguson would like to provide A.F. with his own room, free from distraction and interruptions, and that "[a]ny benefits that could be provided to this family would have a great impact on [A.F.'s] ultimate success." (*Id.*)

### 5.  Other School Records

A.F.'s eighth grade teachers each filled out diagnostic questionnaires in October of 2008.  (R. 491-95.)  In these questionnaires, several teachers noted that he "occasionally" or "often" had trouble "organizing tasks and activities," and that he is "easily distracted by extraneous stimuli." (*Id.*)  Some teachers noted that he "occasionally" or "often" "loses things necessary for tasks or activities" and "fails to give attention to details or makes careless mistakes in school work." (*Id.*)

A.F.'s IEP dated February 27, 2009 stated that he was struggling in all of his classes with the quality of his work.  (R. 552.)  A.F.'s organizational skills were weak and he needed reminders to clear out old material and organize his work.  (*Id.*)  A.F. could only maintain organization for a short period of time.  (*Id.*)  His grades at the time were a D+ in Language Arts, a C in Science, a C in Social Studies, and a C in Math.  (*Id.*)

### C. Hearing Testimony

The initial hearing was held on July 10, 2008. (R. 48.) A.F. appeared at the hearing with Ms Ferguson and his aunt, Tiffany Phillips, and he was represented by paralegal Lawrence McShane. (*Id.*)

### 1. The July 10, 2008 Hearing

### a.) A.F.'s Testimony

A.F. was thirteen years old at the time of the hearing and he had just finished seventh grade. (R. 54.) He stated that he was taking some medication and that he did not experience any negative side effects. (R. 56.) He testified that he was about to start playing on a football team and that he had a good year in school. (*Id.*) He did not get into any trouble in school, and he had to visit the principal's office only once for skipping class (although he was actually in the bathroom at the time). (R. 55.)

A.F. testified that he lived in an apartment with his mom, dad, and five-year-old brother. (R. 56.) He said sometimes he and his brother argue, and other times they get along. (R. 57.) A.F. testified that he is able to get himself up in the morning for school with his alarm clock. (*Id.*) He also stated that he is expected to do his chores after school and his mother usually needs to remind him of this. (R. 61.)

During the summer months, he stays up late watching movies with his family until midnight or 1 or 2 am. (R. 57-58.) During the day, he spends his time playing Play Station, using the computer for MySpace or to look for a summer job, or playing basketball or football with his friends. (R. 58-60.)

A.F. stated that during the school year, he typically takes the bus to school, unless he is running late and his mother has to drive him. (R. 60.) He stated that he once got into a fight on the bus when another student was bothering him. (R. 61.) After this fight,

14

he was not allowed to ride the bus for a week.  (*Id.*)  After school, A.F. stated that he is usually at home doing his homework, watching a movie or doing his chores.  (R. 61.)  His chores include the dishes, taking out the garbage and cleaning his room.  (*Id.*)  A.F. also testified that he usually needs help to get his homework assignments completed.  (R. 63.)  A.F. stated he gets along well with his classmates and his teachers at school.  (*Id.*)

### b.) Ms. Ferguson's Testimony

Ms. Ferguson testified that A.F. was diagnosed with ADHD and sensory integration by Dr. Hammer in April of 2004.  (R. 66.)  She stated that he recently underwent an EEG for his staring spells, but there was no seizure activity detected.  (R. 88.)  In addition, A.F.'s therapist thought that he may have Asperger's, but that has never been diagnosed.  (R. 90.)

She testified that A.F. was taking Daytrana at the time of the hearing, which caused few side effects and has helped A.F. with completing his homework and chores.  (R. 68.)  In the past, he had also taken Adderall and Metadate but was forced to stop because of negative side effects.  (*Id.*)  Ms. Ferguson testified that after Metadate, Dr. Chhabria recommended a lower children's dose of Daytrana, which has been more successful and has given him fewer side effects.  (R. 69.)

Ms. Ferguson testified that A.F. had a very structured schedule that included homework and chores.  (*Id.*)  Because of his ADHD, she did not like to change his routine.  (R. 69.)  She provided examples of his symptoms of ADHD, such as his inability to start a conversation or complete a task, his tendency to rush through tasks, his inability to sit still at times and his staring spells.  (R. 70.)  She stated that A.F. demonstrates "hyperactivity, inattentive, depression, all combined."  (R. 71.)  She also

testified that A.F. will "just jump into a conversation without realizing its an adult conversation." (*Id.*) Ms. Ferguson stated that when A.F. wakes up, he would often be sitting in the living room in a staring spell and would not respond unless he was touched. (R. 72.) When A.F. was finally responsive, he would have a series of questions and would immediately become very impulsive. (*Id.*) She also stated that he will chew on his clothes or lick his lips until they are raw. (R. 71-72.) She testified that A.F.'s disposition is always very impulsive and fast, and when he gets frustrated, he gets very angry. (R. 73.) At times, he is so frustrated he will punch the wall or throw something. (R. 74.)

Regarding personal hygiene, Ms. Ferguson stated that A.F. never wants to take a shower and she frequently has to remind him. (R. 75.) She also testified that he does spend time with other kids, particularly neighbors or classmates who he has known for some time. (R. 75-76.)

Ms. Ferguson stated that in addition to Dr. Hammer, A.F. also has regular visits with Dr. Palloway. In addition, A.F. has recently started seeing a therapist who is helping A.F. with some social communication issues and his anxiety and sensory issues. (R. 77, 82.) A.F. had seen psychiatrist Rebecca Bier but the co-payments started getting to be too much for Ms. Ferguson to afford. (R. 80.) Ms. Ferguson testified that she is applying for disability because she cannot afford the therapies and other programs that A.F. requires. (*Id.*) She works only part time as a primary school teacher so that she can be home with A.F. when he gets home from school. (*Id.*)

Ms. Ferguson testified that A.F.'s sensory problems manifest themselves in that he is startled easily and is fearful of small animals. (R. 83.) She noted that he is also sensitive to people lightly touching him, and he is sensitive to the clothing that he wears and will change clothes several times a day. (R. 86.) He also has a very poor sense of

dressing for the weather, and will often put on a sweater and long pants in the middle of the summer or wear shorts when it is cold. (*Id.*) He is constantly tapping his pencil and chewing the eraser off of it, and he has difficulty recognizing people. (*Id.*)

Ms. Ferguson stated that he was popular at his school, and his teachers do not note any serious behavioral issues. (R. 91.) However, she claims that he is not as popular as the teachers at his school suggest, and that all of his friends are younger than him. (*Id.*) She testified that he is disruptive and often annoys his classmates when they are trying to work. (*Id.*)

### c.) Ms. Phillip's Testimony

A.F.'s aunt, Ms. Tiffany Phillips, also testified at the hearing. (R. 93.) She spends a significant amount of time with him, and she described him as "very overly active." (*Id.*) In particular, she said he loves to move around, "just running, playing ball, wrestling, just doing something that's very intense." (*Id.*) She also stated that he will fight with her sons and he talks excessively. (R. 95.) Often times, A.F. will tell her a story that is confusing or he will be moving around for no reason. (R. 98.) She testified that she thinks his behavior has somewhat improved recently. (R. 96.)

### 2. February 3, 2009 Supplemental Hearing

After the initial hearing, Ms. Ferguson requested a supplemental hearing, which was held on February 3, 2009. At this point, A.F. was represented by Nastassia Johnson, an attorney. (R. 24, 108.) A.F. and his mother testified again, and his father was present as well. (R. 24, 28.) .

### a.) A.F.'s Testimony

17

At the supplemental hearing, A.F. testified that his grades were getting worse because he has been unable to focus.  (R. 25.)  He stated that he has problems with Social Studies and Language Arts in particular.  (R. 26.)  He was able to focus better when pulled out of his classes and given one-on-one attention.  (*Id.*)  He testified that he had friends in his neighborhood, some of whom were his age or older.  (*Id.*)  His favorite subject was math.  (*Id.*)  A.F. testified that he had been playing both football and basketball that year.  (R. 27.)  He was not getting in trouble at school.  (*Id.*)

### b.)  Ms. Ferguson's Testimony

Ms. Ferguson testified that A.F. was in danger of not passing the eighth grade, and his school performance had gotten worse since the initial hearing.  (R. 30.)  A.F. is receiving special education in science, reading, social studies and language arts.  (R. 30.)  She testified that A.F. gets frustrated with his special education teachers, he gets angry and moody when he is unable to complete his work properly, and he often erases his work once he is finished because he does not think he has done it correctly.  (R. 31.)  According to her conversations with his teachers, A.F. often does not turn in his work on time, and he often forgets his homework.  (*Id.*)  She stated that A.F. was in special education for 250 minutes a week, and that he had recently been increased to 52 hours per year.  (R. 29.)  She also stated that he would need supplemental reading classes in high school.  (*Id.*)  A.F. has received extra help in school, but his grades remain low.  (R. 41.)  In particular, A.F. struggles with reading comprehension.  (R. 37.)  Ms. Ferguson often reads with him, and tries to get him to work on comprehension, but it often is impossible for him to visualize or explain what he just read.  (*Id.*)

A.F. had been taking Focalin, which had improved his behavior.  (R. 32.)  However, this caused him to experience chest pains and a heart murmur was detected,

so he stopped taking it. (*Id.*) Once A.F. stopped taking the Focalin, Ms. Ferguson testified that he made "more scattery decisions," he forgets what he has just said, he becomes moody, and he doesn't have a lot of patience. (R. 32.) She testified that he would be unable to complete three consecutive tasks, and if given three instructions he would do part of one, half of the next, and none of the third. (R. 33.) He would have to be taken through each step in order to complete all three tasks. (*Id.*) If she wrote down a set of directions for him, he would still have trouble completing all three of the tasks. (*Id.*) She stated that she gives A.F. a structured schedule after school for completing his homework, such as 20 minutes of science and then 20 minutes of math. (R. 34.) If the homework is broken down for him in this way, he is able to understand and complete his homework and he is less likely to get frustrated. (*Id.*) She claimed that A.F. must be monitored to do his work, but at the same time, he gets frustrated when he is constantly being monitored. (R. 34-35.)

Ms. Ferguson also testified that A.F. often fights with his brother, but their relationship had improved with more supervision. (R. 36.) She reported that sometimes he has problems talking with other children because he says things that are out of context and they may laugh at him. (*Id.*).

Ms. Ferguson testified that A.F. has also been diagnosed with a sensory integration problem. (R. 38.) As a result, A.F. is scared of the dark, he likes dogs but is scared of them, he does not like anything that looks or feels different, and he does not like food very much. (*Id.*) He also does not like unusual noises. (*Id.*)

Ms. Ferguson testified that she does not feel that A.F. can be left home alone or unsupervised. (*Id.*) He is afraid of being alone, and can do dangerous things when left unsupervised. (R. 39.) For example, A.F.'s mother stated that if he begins cooking

something, he will forget about it, or he will put aluminum in the microwave if he is not monitored.  (*Id.*)  She also testified that she is afraid that he might hurt his little brother while they are "play fighting."  (*Id.*)  On several occasions, he has hurt his brother by bending his arm back, choking him, and knocking his teeth out.  (*Id.*)

A.F. continues to have staring spells about once a month.  (R. 40.)  He will continue to stare until she lightly touches him.  (*Id.*)  She also testified that he changes his clothes several times a day because they do not feel right on him.  (R. 41.)  He has also started seeing a counselor, which is helping A.F. to better manage his stress.  (R. 20.)

## II. LEGAL ANALYSIS

### A. Standard of Review

Judicial review of a decision denying SSI benefits to a child claimant is limited to determining whether the ALJ applied the correct legal standards in reaching his or her decision, and whether there is substantial evidence to support the relevant findings. *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001).  In other words, we must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is "more than a mere scintilla of proof."  *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001).  It is "evidence a reasonable person would accept as adequate to support the decision."  *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007).  In determining whether there is substantial evidence, the Court reviews the entire record. *Kepple*, 268 F.3d at 516.  However, our review is deferential, and we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own

judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir.

2003) (citation omitted); *see also Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).

Despite this deferential standard, the Court must undertake a "critical review of

the evidence," and if the ALJ's decision "lacks evidentiary support or an adequate

discussion of the issues," this Court will not affirm it. *Lopez*, 336 F.3d at 539 (citations

omitted). While the ALJ need not discuss every piece of evidence in the record, he

"must build an accurate and logical bridge from the evidence to [his] conclusion." *Dixon

v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Further, the ALJ "may not select and

discuss only that evidence that favors his ultimate conclusion," *Diaz v. Chater*, 55 F.3d

300, 308 (7th Cir. 1995), but "must confront the evidence that does not support his

conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474

(7th Cir. 2004). Ultimately, the ALJ must "sufficiently articulate his assessment of the

evidence to assure us that the ALJ considered the important evidence ... [and to enable]

us to trace the path of [his] reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir.

1993) (citation omitted).

### B. Analysis Under the Social Security Act

Under the Social Security Act, a child is disabled if he or she "has a medically

determinable physical or mental impairment, which results in marked and severe

functional limitations, and which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

1382c(a)(3)(c)(i). A three-step evaluation is required in order to determine whether a

child is disabled. 20 C.F.R. § 416.924(a). The first step is to determine whether the child

is engaged in substantially gainful activity, and if he or she is, then the claim will be

denied.  *Id.*  A child is engaged in substantially gainful activity if he or she is doing significant physical or mental activities for pay or profit.  20 C.F.R. § 416.972.  If a child is not engaged in substantially gainful activity, the next consideration is whether the child's physical or mental impairments are severe.  20 C.F.R. § 416.924(a).  If the child's impairment or combination of impairments is severe, then the next consideration is whether that impairment meets or is functionally equivalent to one of the listings of impairments in 20 C.F.R. Pt. 404 Subpt. P App. 1 (the "Listings").  *Id.*

To determine whether an impairment is the functional equivalent of a Listing, the ALJ must evaluate the combined effects of all medically determinable impairments, even those that are not severe.  *Id.*  In this analysis, the ALJ must determine whether the impairment or combination of impairments functionally equals the listings by assessing the child's functioning in terms of the six domains: 1) Acquiring and Using Information; 2) Attending and Completing Tasks; 3) Interacting and Relating with Others; 4) Moving About and Manipulating Objects; 5) Caring for Self; and 6) Health and Physical Well-being.  20 C.F.R. § 416.926a(b)(1).  In assessing these categories, how appropriately, effectively, and independently the child performs activities is compared to the performance of other children at the same age who do not have impairments.  *Id.*

Functional equivalence exists, and a child qualifies for benefits, if the child has a "marked limitation" in at least two of the six domains listed above or an "extreme limitation" in one of the categories.  20 C.F.R. § 416.926a(a).  A marked limitation is when the child's impairment interferes seriously with the ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2)(i).  It is defined as "more than moderate" but "less than extreme."  *Id.*  It is the equivalent of the functioning that would be expected on a standardized test that is at least two but not more than three standard

deviations below the mean.  *Id.*  An "extreme limitation" is when the child's impairment interferes very seriously with the child's ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2)(ii).  It is defined as any limitation that is more than marked, and it is equivalent to the functioning that can be expected on a standardized test that is more than three standard deviations below the mean.  *Id.*

The evidence relevant to whether a child's limitations are marked or extreme involves both medical and non-medical sources.  20 C.F.R. § 416.924a(b)(3).  The latter may include information from parents, teachers, and other people who know the child, and their descriptions of relevant activities in school, at home, or in the community.  20 C.F.R. §§ 416.924a(b)(3), (e).

### C. Administrative Law Judge Opinion

The ALJ followed the required three-step analysis in making her determination that A.F. did not qualify for disability benefits.  First, the ALJ found that A.F. had not engaged in any substantially gainful activity since January 19, 2007, the application date.  20 C.F.R. § 416.924(a).  At step two, the ALJ found that A.F. suffered from ADHD, as well as a learning disability, partial complex seizure disorder, and sensory disintegration, all of which were severe impairments.  The ALJ also noted that A.F. had a heart murmur, chest pains, and oppositional defiance disorder, but these were less than severe and did not cause more than minimal limitations.

At step three, the ALJ found that A.F. did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  In evaluating the six domains of 20 C.F.R. § 416.926a(b)(1), the ALJ found that A.F. had a marked limitation in Acquiring and Using

Information, and a less than marked limitation in the remaining domains.  Thus, because A.F. did not have a marked limitation in two or more of the domains or an extreme limitation in one of the domains, the ALJ found that he is not disabled under the Act.  *Id.*

Ms. Ferguson now argues that the decision of the ALJ was erroneous for three reasons: 1) the ALJ failed to properly evaluate the opinion of A.F.'s special education teacher, Jan Russert; 2) the ALJ failed to properly consider the evidence supportive of A.F.'s claim that he had a marked limitation in the domain of Attending and Completing Tasks; and 3) the ALJ improperly discredited the Ms. Ferguson's testimony.  We will address each of Ms. Ferguson's arguments below.

## IV.  ANALYSIS

### A. The ALJ Failed to Properly Consider the Opinion of Jan Russert.

Ms. Ferguson's first argument is that the ALJ failed to properly consider the opinion of A.F.'s special education teacher, Jan Russert.  In her Teacher Questionnaire, Ms. Russert responded that A.F. had significant limitations in two domains: Acquiring and Using Information, as well as Attending and Completing Tasks.  Ms. Ferguson asserts that the ALJ merely summarized Ms. Russert's opinion, without explaining whether she accepted it or rejected it, and gave it no analysis at all.  Ms. Ferguson argues that if the ALJ had properly analyzed Ms. Russert's opinion, she would have determined that A.F. suffered from marked limitations in two domains (rather than just one), and therefore, she would have found that A.F. was disabled.

The Commissioner argues that the ALJ did properly analyze Ms. Russert's opinion.  The Commissioner notes that the ALJ did not merely mention the report, but she compared and contrasted Ms. Russert's responses and provided some analysis.

The Commissioner also argues that while some of Ms. Russert's responses indicate that A.F. had a "serious" to "very serious problem" in some categories of the Attending and Completing Tasks domain, she also noted that A.F. had only a "slight problem" in other categories in this domain.  For example, Ms. Russert noted a "serious problem" with focusing long enough to complete tasks, completing work accurately, and carrying out multi-step instructions; yet she noted a "slight problem" in his ability to carry out single step instructions, refocus when necessary, and "no problem" at all in completing homework assignments.  According to the Commissioner, the ALJ did analyze Ms. Russert's questionnaire responses and therefore, there was no error in finding that A.F. did not have a marked limitation in Attending and Completing Tasks.

In rendering his or her decision on a disability, an ALJ must consider all relevant evidence in the case record, which includes opinion evidence from "other sources."  SSR 06-03p, 71 Fed.Reg. 45593-03, at *45596.  "Other sources" includes "educational personnel, such as school teachers, counselors, early intervention team member, developmental center workers, and day center workers."  *Id.* at *45594.  The ALJ should consider the following five factors when evaluating a teacher's opinion: 1) whether the source has examined A.F.; 2) whether a treatment relationship exists; 3) the supportability of an opinion; 4) the consistency of the opinion with other evidence in the record; and 5) the specialization of the source giving the opinion.

In order to remand on these grounds, we must find that the ALJ's assessment of Ms. Russert's opinion lacks evidentiary support or an adequate discussion of the issues.  *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (reversing an ALJ's decision where the 7th Circuit found that the ALJ discounted uncontradicted evidence without explaining his reasons for doing so).  While we may not re-weigh the evidence, resolve conflicts,

decide questions of credibility, or substitute our own judgment, the court is entitled to perform a critical review of the evidence. *Id.* We cannot uphold a decision that fails to mention highly pertinent evidence, or that because of contradictions and missing premises, fails to build a logical bridge between the facts of the case and the outcome. *Id.*

After our review of the ALJ's decision, we agree with Ms. Ferguson that the ALJ's disregard of Jan Russert's opinion lacks evidentiary support and adequate analysis. In finding that A.F. does not have a marked limitation in the Attending and Completing Tasks domain, the ALJ cites to a few statements from A.F.'s mother regarding his ability to "sometimes" do his homework independently and his ability to get his homework done when he is in a different room. The ALJ also relies on A.F's testimony that he can spend time on the computer, go on MySpace and play Playstation, all of which, according to the ALJ, require sustained attention. Notably, the ALJ also states: "[A.F.'s] 7th grade special education teachers also noted no more than a slight problem in this area." However, the ALJ failed to address Ms. Russert's indication that he had "serious" and "very serious" limitations in this particular domain, nor did she analyze why she was disregarding this opinion. Ms. Russert noted that "[A.F.] gets many prompts to redirect to task (5 times per class period). He often gets off track and needs help getting on task or transitioning from task to task." (R. 411.) Ms. Russert also indicated that she was with A.F. during every class period of the day, and she spent about 300 minutes with him per week. In light of her involvement in A.F.'s performance at school, the ALJ was required to, at a minimum, explain why she was not crediting her opinion that A.F. had significant limitations in two domains. *See, e,g.*, *Robinson v. Astrue,* No. 10 C 5056, 2012 WL 3991625, at *12 (N.D. Ill. Aug. 29, 2012) (remanding based on ALJ's failure to properly credit teacher who

found that the claimant had serious or obvious problems after spending more than 372 hours a week with claimant); *Hopgood v. Astrue,* 578 F.3d 696, 700 (N.D. Ill. 2009) (remanding because "the ALJ failed to explain why he did not credit portions of the record that were favorable to [claimant], including teachers reports that found...serious or obvious problems in this domain."); *Murphy*, 496 F. 3d at 634-35 (reversing ALJ's decision where he "did not explain why he gave no weight to the portions of the school documents which support a finding that [claimant] is disabled" and "did little to counter this evidence").  By failing to evaluate or analyze Ms. Russert's opinion, the ALJ has failed to build a logical bridge from the facts to the conclusion, and this warrants reversal. *Hopgood,* 578 F.3d at 700.       The Commissioner also argues that Ms. Russert's opinion was rendered at a time when A.F. was not medicated and that Ms. Ferguson and A.F.'s aunt both testified that his condition improved after he started taking medication. However, this explanation for disregarding Ms. Russert's report is nowhere in the ALJ's opinion, and at this stage in the proceedings, the Commissioner cannot be building the logical bridge for the ALJ.  For these reasons, we remand this matter back to the ALJ for further proceedings.

### B.  The ALJ Failed to Consider Other Substantial Evidence in Finding that A.F. Had Less Than Marked Limitations in the Domain of Attending and Completing Tasks.

Ms. Ferguson next argues that the ALJ failed to consider certain other evidence in the record that supports a finding of a marked limitation in two domains.  In particular, Ms. Ferguson argues that the reports of A.F.'s eighth grade teachers and the report of Dr. Rebecca Bier support a finding that A.F. had a marked limitation in Attending and Completing Tasks.

We disagree with Ms. Ferguson that the ALJ inadequately analyzed Dr. Bier's findings. In the ALJ's opinion, she summarized Dr. Bier's findings and noted that this report was "seemingly based upon the responses/rating of the claimant's behavior by the claimant's mother..., rather than based upon objective evaluation of the claimant. Accordingly, Dr. Bier's statement is accorded minimal weight..., other than [Dr. Bier's] general observations that the claimant is easily distracted, has difficulty focusing and paying attention, but otherwise appeared to be in a good mood on his visits, with good manners, clean clothing...." Based on this analysis, we find that the ALJ provided us with an adequate explanation of what weight she afforded this report and her reasons for this decision.

However, we do agree with Ms. Ferguson's argument regarding the ALJ's analysis of the eighth grade teacher's questionnaire responses. The Attending and Completing Tasks domain refers to "how well the child is able to focus and maintain his attention, and how well he begins, carries through and finishes his activities, including the pace with which he performs activities and the ease with which he completes them." *Hopgood*, 578 F.3d at 700-01 (citing 20 C.F.R. § 416.926a(h)). Five of A.F.'s eighth grade teachers submitted questionnaires regarding A.F.'s behavior and performance. Four out of these five teachers noted that he often has difficulty organizing tasks and activities, or that he does not follow through on instructions or fails to finish his school work. (R. 491-95.) In addition, two of these teachers noted that he is often distracted by extraneous stimuli. (*Id.*) In our opinion, these responses relate directly to the Attending and Completing Tasks domain.

Nevertheless, the ALJ only briefly mentioned these reports in the summary portion of her decision, stating that they "largely indicated no problems to occasional problems

28

relating to ADHD."  In her discussion regarding this domain, the ALJ relied on the reports of A.F.'s seventh grade teachers, and those reports did, for the most part, support her finding that A.F. was not markedly limited in Attending and Completing Tasks.  "Although the ALJ need not discuss every piece of evidence in the record, [she] may not ignore an entire line of evidence that is contrary to the ruling." *Robinson,* 2012 WL 3991625, at *13; *Hopgood*, 578 F.3d at 700 (finding the ALJ's analysis deficient where he "failed to explain why he did not credit portions of the record that were favorable to [claimant], including the teachers' reports that found [claimant] had serious or obvious problems in this domain").  We find that the ALJ was required to, at the very least, discuss this evidence and explain her reasons for finding no marked limitation despite these reports.  Her failure to do so here warrants remand for further proceedings.

### C.  The ALJ Failed to Properly Evaluate Ms. Ferguson's Testimony

Lastly, Ms. Ferguson argues that the ALJ erred because she did not adequately explain why she found Ms. Ferguson's testimony was not credible.  Ms. Ferguson asserts that the ALJ did not adequately explain why it was unreasonable for A.F.'s impairments to cause the limitations that Ms. Ferguson has claimed.  Ms. Ferguson also asserts that if the ALJ did rely on her testimony, this testimony would support a finding of a marked limitation in two domains.  In response, the Commissioner argues that the ALJ did not find Ms. Ferguson to be not credible; in fact, the Commissioner states, the ALJ relied on her testimony, and determined that it failed to show a marked limitation in Attending and Completing Tasks.

 "The ALJ's credibility determinations are entitled to special deference because the ALJ has the opportunity to observe the claimant testifying." *Jones v. Astrue,* 623

F.3d 1155, 1160 (7th Cir. 2010). Accordingly, we reverse credibility determinations only if they are "patently wrong." *Id.* Despite this "special deference," the ALJ is still required to articulate her reasoning and discuss or distinguish any relevant contrary evidence. *Clifford*, 227 F.3d at 870. Under Social Security Regulation 96-7p, an ALJ's determination or decision regarding credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."

We find that the ALJ's perfunctory analysis here fails to comply with this provision and Seventh Circuit precedent. *See, e.g., Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011); *Brindisi*, 315 F.3d at 787–88; *Zurawski,* 245 F.3d at 887. The ALJ summarized the testimony of Ms. Ferguson, including some testimony that is relevant to the Attending and Completing Tasks domain. The ALJ stated: "She...asserts that the claimant has difficulty understanding instructions and requires a lot of one-on-one attention. She testified that he cannot follow multiple instructions, and that if given 3 things to do, he would do part of 2 and none of the third.... She alleges that he has difficulty finishing or completing tasks, stating that he starts things and does not finish them, requiring help with redirection and staying on task." Following this summary, the ALJ merely recited the boilerplate language that "based on the evidence, the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms. However, the statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not credible to the extent that they are inconsistent with [the] finding that

the claimant does not have an impairment or combination of impairments that functionally equals the listings for the reasons explained below."

We agree with Ms. Ferguson that the ALJ should have specified why she found that at least some of Ms. Ferguson's testimony lacked credibility. The ALJ did rely on some of Ms. Ferguson's testimony in making her findings (a fact, from which the Commissioner would like us to infer that the ALJ did, in fact, find Ms. Ferguson's testimony to be credible). However, in finding that A.F. did not have a marked limitation in Attending and Completing Tasks, the ALJ never referred back to Ms. Ferguson's testimony that he could not, in fact, complete tasks without substantial assistance. Nor did the ALJ explain why she was not crediting this testimony, or why she was giving substantial weight to some, but not all, of Ms. Ferguson's testimony. This perfunctory analysis is insufficient. SSR 96-7p, 1996 WL 374186, at *4 ("The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision."); *Giles v. Astrue,* 483 F.3d 483, 488-89 (7th Cir. 2007) ("Here, the ALJ did not make a credibility assessment as to [claimant's mother's] testimony, though the ALJ did recite some parts of the testimony. If [her] testimony was not credible, the ALJ was obligated to explain the basis of that assessment. If, on the other hand, [her] testimony was credible, the ALJ was required to explain why the testimony did not support a finding that [claimant] was markedly limited in attending and completing tasks."). On remand, the ALJ is required to make a more detailed explanation of why she failed to credit Ms. Ferguson's testimony supporting a marked limitation in two domains.

**III. CONCLUSION**

For the reasons set forth above, A.F.'s motion for summary judgment is granted in part and the Commissioner's motion for summary judgment is denied. The case is remanded to the Social Security Administration for further proceedings consistent with this opinion. It is so ordered.

ENTERED:

MICHAEL T. MASON
United States Magistrate Judge

Dated:        March 1, 2013